PEOPLE v JUSTICE (AFTER REMAND)

Docket No. 105352. Argued November 13, 1996 (Calendar No. 11). Decided May 16, 1997.

Thomas R. Justice was indicted by a multicounty grand jury on one count of conspiracy to possess with intent to deliver more than 650 grams of cocaine and one count of conspiracy to deliver over 225 grams but less than 650 grams of cocaine. The 90th District Court, Harvey C. Varnum, J., bound the defendant over on the charged offenses, rejecting the defendant's objections that the charges were improper because they aggregated a series of separate transactions in order to charge a higher offense, and concluding that probable cause existed to believe that he committed the offenses. The Emmet Circuit Court, Richard M. Pajtas, J., granted the defendant's motion to quash, finding that the district court abused its discretion, and that there was insufficient evidence to establish probable cause that the defendant conspired to possess with an intent to deliver the volume of cocaine as charged. The Court of Appeals, WAHLS, P.J., and HOOD and CONNOR, JJ., reversed in an unpublished peremptory order and reinstated the charges (Docket No. 162372). The Supreme Court, in lieu of granting leave to appeal, vacated the order and remanded the matter for plenary consideration. 444 Mich 964 (1994). On remand, the Court of Appeals, DOCTOROFF, C.J., and A. L. GARBRECHT, J. (WHITE, J., dissenting), reversed in an unpublished opinion per curiam, and reinstated the charges (Docket No. 173326). The defendant appeals.

In an opinion by Justice RILEY, joined by Chief Justice MALLETT, and Justices BRICKLEY, BOYLE, and WEAVER, the Supreme Court held:

In order to bind a defendant over for conspiracy there must be probable cause to believe that the respective conspirators intended to accomplish the substantive offense. The district court's finding, with respect to count I, that probable cause existed to believe that the defendant was guilty of conspiracy, did not constitute an abuse of discretion because the evidence was sufficient to allow a reasonable trier of fact to infer that the defendant and his coconspirator specifically intended to possess with an intent to deliver over 650 grams of cocaine at a point during the period charged by the people. With respect to count II, it was not an abuse of discretion to find that probable cause existed to believe that the defendant con-

spired with another to possess with an intent to deliver over 225 grams but less than 650 grams of cocaine. Testimony at the preliminary examination permitted the district court to reasonably infer that the defendant and the second coconspirator combined to accomplish the criminal objective as charged.

1. Conspiracy is defined at common law as a partnership of two or more persons in criminal purposes that is complete upon formation of an unlawful agreement. It must be shown that the parties specifically intended to further, promote, advance, or pursue an unlawful objective. Direct proof of agreement is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties. Courts must examine the circumstantial evidence to determine the conspiracy's scope; however, any inferences drawn must be reasonable. To convict a person of conspiracy to possess with an intent to deliver a controlled substance, the people must prove that the defendant possessed the specific intent to deliver the statutory minimum of a controlled substance as charged, that the conspirators possessed the specific intent to deliver the statutory minimum as charged, and that the conspirators possessed the specific intent to combine to deliver to a third person the statutory minimum as charged.

2. With respect to count I the people presented evidence that would permit a person of ordinary prudence and caution to conscientiously entertain a reasonable belief that the defendant could have conspired with a coconspirator to possess with an intent to deliver over 650 grams of cocaine, the coconspirator could have conspired with the defendant to possess with an intent to deliver over 650 grams of cocaine, and the defendant and the coconspirator could have possessed the intent to combine to deliver to another coconspirator and others over 650 grams of cocaine. It was not an abuse of discretion by the district court to so find.

3. With respect to count II, it was not an abuse of discretion to find that probable cause existed to believe that the defendant could have conspired with a second coconspirator to possess with an intent to deliver more than 225 but less than 650 grams of cocaine at a point during the period charged by the people.

Affirmed.

Justice CAVANAGH, dissenting, stated that the district court abused its discretion in binding the defendant over on the conspiracy charges of possession with intent to deliver over 650 grams of cocaine, possession with intent to deliver between 225 and 650 grams of cocaine.

Notably absent from the majority's holding and analysis is the requirement that both conspirators must possess the specific intent

to deliver the charged amounts from the time of the formation of the conspiratorial agreement that is the basis of the conspiracy charge. For the defendant to be guilty of the charged conspiracy counts, Mr. Justice and his coconspirators would have had to have intended to deliver the charged amounts from the time that they formed an agreement to deliver the cocaine to third persons.

With regard to count I, the record is void of any evidence that there was any kind of agreement that there would be deliveries of the quantities necessary to reach the level charged in this count. Rather than being considered as part of an ongoing conspiracy to deliver cocaine, the testimony indicates that the drug transactions are properly labeled as separate transactions. To have Mr. Justice bound over on count II, the prosecutor would need to pile inference upon inference. Because there is no evidence in the record to indicate that Mr. Justice knew that a coconspirator intended to redistribute some of the cocaine, the prosecution must infer that intent from the quantities delivered to the coconspirator. Then, the prosecution must infer that she intended to redistribute the charged amount of between 225 and 650 grams. It was an abuse of discretion for the court to bind Mr. Justice over on this count because there was insufficient evidence presented at the preliminary examination to support a finding of probable cause.

Justice KELLY took no part in the decision of this case.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Diane M. Smith*, Prosecuting Attorney, and *Robert J. Engel*, Assistant Prosecuting Attorney, for the people.

*Steven C. Bullock* for the defendant.

Amicus Curiae:

*Stuart G. Friedman* for Criminal Defense Attorneys of Michigan, Inc.

AFTER REMAND

RILEY, J. In the matter before us, this Court is asked to decide whether the district court abused its discretion in binding defendant over on two counts of conspiring to possess with an intent to deliver cocaine,

where one count involved more than 650 grams and the other was for over 225 grams but less than 650 grams of cocaine. The only evidence presented regarding each count was the coconspirators' testimony, which established that defendant delivered various amounts of cocaine over defined periods of time.

This Court holds that in order to bind defendant over on the two counts of conspiracy there must be probable cause to believe that defendant and the coconspirators shared the specific intent to accomplish the substantive offenses charged. We conclude, with respect to count I, that the district court's finding that probable cause existed to believe defendant was guilty of conspiracy to possess with an intent to deliver more than 650 grams of cocaine did not constitute an abuse of discretion because the evidence was sufficient to allow a reasonable trier of fact to infer that defendant and the coconspirator had a specific intent to deliver the statutory amount as charged. Also, we conclude, with respect to count II, that it was reasonable to find probable cause existed to believe that defendant conspired with the coconspirator to possess with an intent to deliver over 225 grams but less than 650 grams of cocaine because there was testimony at the preliminary examination that enabled the district court to infer that defendant and his coconspirator specifically intended to combine to deliver over 225 but less than 650 grams of cocaine.

Therefore, we affirm both the Court of Appeals decision concluding that there was no abuse of discretion in the district court's bindover on count I and

its decision reversing the circuit court's quashing of the indictment on count II.

I

On June 26, 1991, pursuant to MCL 767.7b(1), (2); MSA 28.950(1), (2), defendant was indicted by a multicounty grand jury on two counts of conspiracy to possess with an intent to deliver cocaine. Count I alleges that defendant conspired with Cathy Boyer to possess with an intent to deliver more than 650 grams of cocaine between the fall of 1989 and the summer of 1990 in violation of MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i). Count II alleges that defendant conspired with Suzanne Kausler to possess with an intent to deliver over 225 grams but less than 650 grams of cocaine between March 1990 and December 1990 in violation of MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii).[1]

A preliminary examination was held on May 13, 1992. At the hearing, it was established that defendant, who lived in Ann Arbor, Michigan, supplied

---

[1] The indictment against defendant provided in pertinent part:

### Count I

[Defendant], . . . from about Fall, 1989 through Summer, 1990, . . . did unlawfully conspire, combine, confederate and agree together with Kathy Boyer to Deliver and/or Possess with Intent to Deliver More than 650 grams of a mixture containing the controlled substance cocaine; contrary to MCL 333.7401(2)(a)(i); MSA 14.15(7401)(2)(a)(i).

### Count II

[Defendant], . . . from about March, 1990, through December, 1990, . . . did unlawfully conspire, combine, confederate and agree together with Susan Cosler [sic] to Deliver and/or Possess with Intent to Deliver more than 225 grams, but less than 650 grams of a mixture containing the controlled substance cocaine; contrary to MCL 333.7401(2)(a)(ii); MSA 14.15(7401)(2)(a)(ii).

cocaine to Cathy Boyer, who resided in Charlevoix, Michigan.[2] Boyer obtained the cocaine for herself and for her husband. Boyer and her husband were introduced to Suzanne Kausler[3] in February 1990 by a mutual friend, Anna Nawrocki.[4] Boyer eventually began purchasing cocaine on Kausler's behalf.[5] Boyer would give two-thirds of the cocaine she purchased to Kausler, and keep one-third for herself as payment.

When Boyer wanted to purchase cocaine, she would telephone defendant. Sometimes she would drive to Ann Arbor to make the purchases, while at other times she and defendant would meet either in West Branch or Bay City, which was approximately halfway between their homes. Boyer's husband, and other individuals, occasionally accompanied her on her trips to Ann Arbor.[6] When Boyer would arrive at defendant's residence, her passengers would usually wait for her while she met with defendant to obtain the cocaine. These individuals were aware of the purpose of the drive and sometimes used some of the

[2] Boyer and her husband were permitted to plead guilty to possession with an intent to deliver less than 50 grams of cocaine, MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv), in exchange for their testimony and received lifetime probation.

[3] Kausler resided in Petoskey, Michigan.

[4] Kausler entered into a plea agreement with the people, in which she agreed to testify in exchange for being permitted to plead guilty to possession with an intent to deliver less than 50 grams of cocaine. MCL 333.7401(2)(a)(iv); MSA 14.15(7401)(2)(a)(iv).

[5] Boyer started to purchase larger amounts of cocaine sometime during the spring of 1990. Boyer testified that she met Kausler at a birthday party held on February 13 or 14, 1990, and at that party Kausler testified she first tried cocaine.

[6] The preliminary examination is unclear regarding exact dates. Therefore, we are unable to determine the specific date she started to bring others on her trips. Boyer did testify, however, that she started visiting defendant in the fall of 1989 but, that she did "not always" get cocaine on these visits.

cocaine on the drive back. Boyer testified that she drove to Ann Arbor on an irregular basis, but there was testimony that she drove there approximately twice a week, from March through the beginning of May 1990. She drove to Ann Arbor six or seven times before making her first purchase for Kausler and traveled to Ann Arbor an additional six or seven times with Kausler.[7] Boyer also testified that she would receive between three and seven ounces on these trips (approximately between 84 and 196 grams of cocaine).

Boyer purchased approximately fifty-four ounces (1,530.90 grams) of cocaine from defendant between the fall of 1989 until she moved to Florida in May of 1990, because she feared the possibility of a grand jury indictment. Thereafter, Kausler began purchasing directly from defendant. Besides meeting defendant at various locations in Ann Arbor, she met him[8] between

---

[7] The record is also unclear regarding the total number of trips Boyer made to Ann Arbor, West Branch, and Bay City, respectively.

James Yeager, a prosecution witness, stated that he may have made as many as "a dozen, or less" trips where he met with defendant (Yeager agreed "to plead guilty to Possession of Cocaine," in exchange for his testimony). He testified that the "[s]mallest, [purchase was] probably a half ounce [approximately 14.175 grams] . . . [and that] . . . the largest . . . [was] four ounces [113.40 grams]," with four ounces being purchased on "just . . . one of the trips." Nonetheless, the district court noted that Yeager could not testify "with any possible accuracy," and sustained defense counsel's objection regarding "an estimate of the total amount, of ounces, for all the trips that [he] made."

[8] Kausler testified that she arranged to meet defendant in West Branch after Boyer had moved to Florida:

[The People]: How were the arrangements made to have a transaction there?

\*    \*    \*

[Kausler]: I had [defendant's] phone number, and we'd made an arrangement on the phone.

two and five times in West Branch, purchasing any-
where from 56.70 grams to 113.40 grams of cocaine.
At some point, defendant knew Kausler was distribut-
ing to others some of the cocaine she received.[9] Addi-
tionally, on at least one occasion, defendant drove to
Kausler's residence to visit and bring her cocaine. At
that same time, defendant and Kausler reached an
agreement "for a very large purchase" of 226.80 grams
of cocaine. She paid him approximately $8,800.
Kausler purchased approximately twenty ounces (567
grams) of cocaine from the time Boyer moved to
Florida until December 1990.[10]

At the conclusion of the preliminary examination,
defendant objected to being bound over, arguing that

---

[9] The people questioned Boyer regarding defendant's knowledge of
what Kausler was doing with the cocaine:

> [Boyer]: You know. I mean, we'd told him [defendant] that she
> was, you know, she was doing a lot of it herself, but she was also
> having other people distribute it. But, you know, that was, you
> know, how else would she be able to get three ounces [85.05
> grams] and have it gone in three days, and be wanting more, if she
> wasn't getting rid of some of it. She couldn't physically do that
> much.

[10] When questioned by the people, Kausler testified about the approxi-
mate amount she purchased from defendant:

> [The People]: What would you say would be the total amount of
> cocaine that you purchased from [defendant] from the time that
> you first became involved with him, until the time you stopped
> using?
> [Kausler]: Including Cathy [Boyer]?
> [The People]: Yes.
> [Kausler]: I'm trying to remember what it said in the, uh, testi-
> mony this morning, that I was reading. Because I'm—I have a
> mental block right now. I can't even think.
> [The People]: Okay. Well, how about just time [sic] period after
> Cathy [Boyer] left? From Memorial day 'til the time you quit?
> [Kausler]: I'm gonna say twenty—fifteen, twenty ounces.

the people failed to present evidence that would permit a finding that probable cause existed to believe that defendant intended to deliver the statutory amounts as charged, i.e., he intended to combine with Boyer and Kausler, respectively, to deliver the statutory amounts as charged, and Boyer and Kausler intended to combine with defendant to deliver the statutory amounts as charged to a third party. The people argued that case law precedent permitted the aggregating of the various amounts exchanged when conspiracy is at issue. They contended that it was legally permissible to infer defendant's specific intentions to deliver the statutory amounts charged with respect to each count and that a reasonable inference could be made to believe that the cocaine was redistributed to third parties on the basis of volume alone.[11]

Finding persuasive the people's contention, the district court concluded that probable cause existed to believe defendant committed the charged offenses.

On November 3, 1992, the circuit court concluded that the district court abused its discretion, finding that there was insufficient evidence at the preliminary examination "to establish probable cause that the defendant conspired to deliver the volume charged."

The Court of Appeals peremptorily reversed the circuit court's order and reinstated the charges. On February 28, 1994, in lieu of granting leave to appeal, this Court vacated the Court of Appeals peremptory order

---

[11] The people vigorously stressed this point because it was concerned about future arguments regarding Wharton's Rule. See *People v Davis*, 408 Mich 255, 285; 290 NW2d 366 (1980) ("Wharton's Rule declares that an agreement to commit an offense by its nature requires the cooperative action of two or more persons cannot be prosecuted as a conspiracy").

and remanded the matter for plenary consideration.[12]
On December 28, 1995, the Court of Appeals reversed
the circuit court's order and reinstated the charges.
We subsequently granted defendant's motion for
immediate consideration.[13]

II

In a preliminary examination, a district court's
function is to determine whether the evidence is suffi-
cient to cause an individual marked by discreetness
and caution to have a reasonable belief that the
defendant is guilty as charged. *People v King*, 412
Mich 145, 152-153; 312 NW2d 629 (1981); *People v
Asta*, 337 Mich 590; 60 NW2d 472 (1953).[14] A bindover
is not a finding of guilt beyond a reasonable doubt.
Rather, " '[a] preliminary hearing,' " the Supreme
Court has said, " 'is ordinarily a much less searching
exploration into the merits of a case than a trial, sim-
ply because its function is the more limited one of
determining whether probable cause exists to hold
the accused for trial.' " *Coleman v Burnett*, 155 US
App DC 302, 316; 477 F2d 1187 (1973), quoting *Bar-*

---

[12] 444 Mich 964 (1994).

[13] 451 Mich 894 (1996) (The grant was limited to whether the district
court improperly concluded that it could aggregate the various drug trans-
actions and find probable cause to charge defendant with two counts of
conspiracy).

[14] In *King, supra* at 153-154, we remarked:

The [district court] "must have . . . good reason to believe [the
defendant is] guilty of the crime charged." The [district court] has
"the duty to pass judgment not only on the weight and competency
of the evidence, but also the credibility of the witnesses" and may
consider evidence in defense. He or she should not, however, dis-
charge "when evidence conflicts or raises reasonable doubt of [the
defendant's] guilt," since that presents the classic issue for the trier
of fact. [Citations omitted.]

*ber v Page*, 390 US 719, 725; 88 S Ct 1318; 20 L Ed 2d 255 (1968).[15] In *Coleman*, the court stated:

> It is the contrast of probable cause and proof beyond a reasonable doubt that inevitably makes for examinatorial differences between the preliminary hearing and the trial. Probable cause signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. Proof beyond a reasonable doubt, on the other hand, connotes evidence strong enough to create an abiding conviction of guilt to a moral certainty. The gap between these two concepts is broad. *A magistrate may become satisfied about probable cause on much less than he would need to be convinced. Since he does not sit to pass on guilt or innocence, he could legitimately find probable cause while personally entertaining some reservations.* By the same token, a showing of probable cause may stop considerably short of proof beyond a reasonable doubt, and evidence that leaves some doubt may yet demonstrate probable cause. [*Id.* at 316-317 (emphasis added).]

The decision to bind a defendant over is reviewed for abuse of discretion. *King, supra; People v Talley*, 410 Mich 378; 301 NW2d 809 (1981). Thus, in this case, we review for abuse of discretion the district court's determination that the evidence was sufficient to warrant a bindover on each count of conspiracy, i.e., we decide whether the evidence was "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of [defendant's] guilt"[16] for (1) conspiring with Boyer to possess with an intent to deliver more than 650 grams of cocaine and (2) conspiring with Kausler to possess

---

[15] See also *People v Hill*, 433 Mich 464, 469; 446 NW2d 140 (1989), citing *People v Doss*, 406 Mich 90; 276 NW2d 9 (1979).

[16] See *Coleman v Burnett, supra* at 317.

with an intent to deliver over 225 grams but less than 650 grams of cocaine.

## III

Conspiracy is defined by common law as " 'a partnership in criminal purposes . . . .' " *People v Atley*, 392 Mich 298, 310; 220 NW2d 465 (1974), quoting *United States v Kissel*, 218 US 601, 608; 31 S Ct 124; 54 L Ed 1168 (1910).[17] Under such a partnership, two or more individuals must have voluntarily agreed to effectuate the commission of a criminal offense.[18] Establishing that the individuals specifically intended to combine[19] to pursue the criminal objective of their agreement is critical because " '[t]he gist of the offense of conspiracy lies in the unlawful agreement' . . . [meaning] . . . [t]he crime is complete upon for-

---

[17] The statutory provision merely prescribes punishment for conspiring to commit the substantive offense:

Any person who conspires together with 1 or more persons to commit an offense prohibited by law, or to commit a legal act in an illegal manner is guilty of the crime of conspiracy punishable as provided herein:

. . . [T]he person convicted under this section shall be punished by a penalty equal to that which could be imposed if he had been convicted of committing the crime he conspired to commit and in the discretion of the court an additional penalty of a fine of $10,000.00 may be imposed. [MCL 750.157a(a); MSA 28.354(1)(a).]

[18] See, e.g., *United States v Flores-Rivera*, 56 F3d 319, 323 (CA 1, 1995), quoting *United States v Piper*, 35 F3d 611, 615 (CA 1, 1994) ("The government must prove that the defendant possessed both 'an intent to agree and an intent to effectuate the commission of the substantive offense' ").

[19] The term "combine" means that all the participants formed an agreement, express or implied, to accomplish the objective of the conspiracy. That is, all parties shared knowledge that the narcotics are ultimately to be delivered to a third party for consumption and all agreed to meet this objective of delivery by fulfilling their agreements. See, e.g., *People v Blume*, 443 Mich 476; 505 NW2d 843 (1993); *Atley, supra; People v Missouri*, 100 Mich App 310; 299 NW2d 346 (1980).

mation of the agreement . . . ." *People v Carter*, 415 ·
Mich 558, 568; 330 NW2d 314 (1982).

The specific intent to combine, including knowl-·
.edge of that intent, must be shared by two or more
individuals[20] because "there can be no conspiracy
·without a combination of two or more."[21] *People v
Blume*, 443 Mich 476, 485; 505 NW2d 843 (1993);
*Atley, supra* at 310. This combination of two or more
is essential because "[t]he rationale underlying . . . ·
[the crime of] conspiracy . . . is based on the
increased [societal] dangers presented by the agree-
ment between the plurality of actors." *People v Davis*,
408 Mich 255, 273, n 5, 279; 290 NW2d 366 (1980).[22]

---

[20] An agreement to commit a particular crime cannot be prosecuted as
a conspiracy where the number of alleged coconspirators does not exceed
the minimum number of persons logically necessary to complete the sub-
stantive offense. *Davis*, n 11 *supra*.

[21] *Blume*, n 19 *supra* at 482. In *Blume, supra* at 484, this Court noted
that "intent" and "knowledge" of that intent is essential: "Knowledge" is
required because "[w]ithout the knowledge, the intent cannot exist."
*Direct Sales Co v United States*, 319 US 703, 711; 63 S Ct 1265; 87 L Ed .
1674 (1943). *United States v Falcone*, 311 US 205, 210-211; 61 S Ct 204; 85
L Ed 128 (1940). While, "intent" is required because knowing that "some-
one proposes unlawful action alone is not enough to find involvement in a
conspiracy . . . [i.e.] '[t]hose having no knowledge of the conspiracy are
not conspirators, *United States v Hirsh*, 100 US 33, 34 [25 L Ed 539
(1879)] . . . ; [for example] one who without more furnishes supplies to
an illicit distiller is not guilty of conspiracy even though his sale may have
furthered the object of a conspiracy to which the distiller was a party but
which the supplier had no knowledge.' *Falcone, supra* at 210-211."
The dissent went further by remarking:

[W]hile "knowledge is the foundation of intent," and mere knowl-
edge of a conspiracy or its illegal objective, *without more, is not
enough to prove intent,* we may examine the defendant's conduct
to determine whether the defendant provided "informed and inter-
ested cooperation, stimulation, [or] instigation." [*Blume, supra* at
507-508 (BOYLE, J., dissenting; citations omitted; emphasis added).]

. [22] In *Blume, supra* at 508-509 (BOYLE, J., dissenting), citing *Carter,
supra* at 570, quoting *Callanan v United States*, 364 US 587, 593-594; 81 S
Ct 321; 5 L Ed 2d 312 (1961), the Court noted:

Accordingly, there must be proof demonstrating that the parties specifically intended to further, promote, advance, or pursue an unlawful objective. *Atley, supra* at 311.

Identifying the objectives and even the participants of an unlawful agreement is often difficult because of the clandestine nature of criminal conspiracies. Thus, direct proof of the conspiracy is not essential; instead, proof may be derived from the circumstances, acts, and conduct of the parties. See, e.g., *People v Brynski*, 347 Mich 599; 81 NW2d 374 (1957).[23] Inferences may be made because such evidence sheds light on the coconspirators' intentions.

> A criminal agreement is defined by the scope of the commitment of its co-conspirators. See generally Marcus, P, *Prosecution and Defense of Conspiracy Cases*, §§ 4:01-4:02 (1995). Thus, where a defendant is unaware of the overall objective of an alleged conspiracy or lacks any interest in, and therefore any commitment to, that objective, he is not a member of the conspiracy. [*United States v Smith*, 82 F3d 1261, 1269 (CA 3, 1996).]

---

The agreement to commit a criminal act that is the gist of the offense of conspiracy is punished because of the "special danger to society presented by group as opposed to individual activity.

"Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality. Group association for criminal purposes often, if not normally, makes possible the attainment of ends more complex than those which one criminal could accomplish."

[23] In *Brynski, supra* at 605, citing *People v Beller*, 294 Mich 464; 293 NW 720 (1940), this Court observed:

The rule has long been recognized that a conspiracy may, and generally is, established by circumstantial evidence and that positive proof is not required but the circumstances must be within safe bounds of relevancy and be such as to warrant a fair inference of the ultimate facts.

"[C]ourts must look to circumstantial evidence to determine the conspiracy's scope";[24] however, any inferences drawn must be reasonable. Such an approach is essential so that it may be accurately ascertained what particular substantive offense was intended by the coconspirators.[25]

The predicate substantive offenses with which defendant was charged are embodied in MCL 333.7401; MSA 14.15(7401). It provides, in pertinent part:

(1) Except as authorized by this article, a person shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance, a prescription form, an official prescription form, or a counterfeit prescription form. . . .

(2) A person who violates this section as to:

(a) A controlled substance classified in schedule 1 or 2 that is a narcotic drug or a drug described in section 7214(a)(iv) and:

---

[24] *United States v Kalish*, 690 F2d 1144, 1151 (CA 5, 1982).

[25] Such evidence may include "the conduct of the alleged participants or evidence of a scheme." *United States v Morgan*, 835 F2d 79, 82 (CA 5, 1987). The evidence, however, must show beyond a reasonable doubt that two or more persons came to a mutual understanding to violate the particular laws in question. *Id.*

For example, in *People v Missouri*, n 19 *supra*, the defendants argued that the evidence only established a "buyer-seller relationship." The Court of Appeals disagreed by concluding as follows:

[A]*ll parties shared the knowledge that the narcotics were to be ultimately delivered for consumption by street users. All agreed to meet the object—delivery—by fulfilling their agreements* to provide narcotics at various links along the chain . . . . [*Id.* at 343 (emphasis added).]

On the basis of this evidence, the Court held that a "chain" conspiracy was established, i.e., drug smugglers sold to intermediaries who, in turn, sold to retailers. *Id.* at 343, citing *United States v Bruno*, 105 F2d 921 (CA 2, 1939), rev'd on other grounds 308 US 287; 60 S Ct 198; 84 L Ed 257 (1939). See also *People v Cyr*, 113 Mich App 213; 317 NW2d 857 (1982).

(i) Which is in an amount of 650 grams or more of any mixture containing that substance is ·guilty of a felony and shall be imprisoned for life.

(ii) Which is in an amount of 225 grams or more, but less than 650 grams, of any mixture containing that substance is guilty of a felony and shall be imprisoned for not less than 20 years nor more than 30 years.

To be convicted of conspiracy to possess with intent to deliver a controlled substance, the people must prove that (1) the defendant possessed the specific intent to deliver the statutory minimum as charged, (2) his coconspirators possessed the specific intent to deliver the statutory minimum as charged, and (3) the defendant and his coconspirators possessed the specific intent to combine to deliver the statutory minimum as charged to a third person. See, e.g., *Blume, supra* at 485, 508, n 31.[26]

IV

The question that we are asked˙ to decide is not whether the evidence presented at the preliminary examination was sufficient to sustain a conviction of the offenses as alleged,[27] but, rather, whether the evidence presented was sufficient to enable the district court to believe probable cause existed to bind defendant over on two counts of conspiracy, i.e.,

---

[26] The establishment of a mere buyer-seller relationship will not evidence a conspiracy to possess with intent to deliver a controlled substance because the consummation of the crime of conspiracy necessarily involves the cooperation of two persons. *Blume, supra* at 482, n 11, citing *People v Puig*, 85 Misc 2d 228, 232; 378 NYS2d 925 (1976). Rather, in order to properly prosecute a drug conspiracy case, the unlawful agreement must have included a plurality of concerted action that increased the likelihood of the attainment of the coconspirators' criminal objective, because the applicability of Wharton's Rule depends on the elements encompassing the coconspirators' targeted substantive offense.

[27] See *Coleman, supra* at 316-317.

whether the evidence was sufficient to enable a person marked by common sense to have entertained a reasonable belief of defendant's guilt for (1) conspiring with Boyer to possess with an intent to deliver over 650 grams of cocaine, and (2) conspiring with Kausler to possess with an intent to deliver over 225 grams but less than 650 grams of cocaine.

A

The Court of Appeals addressed a similar issue in *People v Porterfield*, 128 Mich App 35, 38; 339 NW2d 683 (1983). In *Porterfield*, the defendant argued that the evidence presented at trial "was insufficient . . . to establish one conspiracy . . . ." Specifically, the defendant contended "that it was error to charge him with an ongoing conspiracy to deliver over 50 grams of a mixture containing heroin rather than multiple separate conspiracies to deliver amounts under 50 grams." *Id.* at 41. He "base[d] his argument solely upon the fact that the alleged separate transactions could not be aggregated to show that there was an agreement to deliver over 50 grams of a mixture containing a controlled substance" because

> the evidence merely showed day-to-day operations in which there were no outstanding agreements between the parties beyond the consignment sale of 10 to 20 coin envelopes which held a mixture containing heroin to the two runners whose testimony at trial provided the primary evidence . . . . [*Id.* at 38.]

However, before it addressed the defendant's argument, the *Porterfield* Court concluded that the people established that (1) the defendant possessed the "intent to deliver over 50 grams of a mixture contain-

ing heroin,"[28] (2) defendant's coconspirators each "had the intent to deliver over 50 grams of a mixture containing heroin,"[29] and (3) the defendant and his coconspirators possessed "the intent to combine with others to deliver over 50 grams of a mixture containing heroin" to the streets for profit.[30] Having con-

---

[28] The Court deduced from the following evidence that the defendant had the specific "intent to deliver" over fifty grams of heroin: the drug deliveries occurred almost daily, the defendant, purchased a large number of coin wrappers that he used to package the drugs, testimony of coconspirators evidenced the existence of a profitable drug enterprise, all coconspirators kept track of their part of the drug venture and fulfilled their part of the agreement, the defendant introduced his coconspirators to the customers to foster trust between them, when the coconspirators sold their drug supply they contacted the defendant who then would "cut and mix[ ] more for sale," an office supply employee testified that the defendant, accompanied by one of the coconspirators, "purchased large quantities of coin envelopes," and expert testimony established that the volume defendant was dealing in "would equal 56 grams of heroin." *Id.* at 39-40.

[29] The Court deduced from the following evidence that coconspirators had the specific intent to deliver over fifty grams of heroin:

> [T]here was sufficient evidence to prove beyond a reasonable doubt that the coconspirators, Facen and Williams, combined with the defendant, each having the knowledge that they were going to deliver and continue to deliver heroin for profit. The evidence established that both Facen and Williams had the requisite intent to commit the crime of delivery of a controlled substance. [*Id.* at 40.]

[30] The Court deduced the scope of the coconspirators' unlawful agreement from the following evidence:

> [T]hat *there was sufficient evidence to establish defendant's intent to combine with others* to deliver over 50 grams of a mixture containing heroin. Although a codefendant was acquitted, *testimony established that there was an intent to combine with Facen and Williams to deliver the narcotics.* Furthermore, the *testimony also indicated that defendant introduced Williams to established customers* so that Williams could be trusted on the street. *Facen and Williams helped package the merchandise for sale.* Facen received the heroin from either Williams or the defendant. Both Williams and Facen's *testimony tended to show that the sales* were not isolated incidents designed for a quick profit but *were part of an ongoing venture to deliver heroin as long as it could be supplied,* and sales were made in different areas where

cluded that the evidence was sufficient to support the conspiracy conviction, the *Porterfield* Court then addressed the defendant's argument regarding "the accumulation of the alleged multiple transactions into one general conspiracy . . . ." *Id.* at 39. The Court stated that the alleged separate drug transactions were "smaller conspiracies constituting parts of a 'single scheme or plan,'" because the evidence established that the conduct of the defendant and his coconspirators was all in furtherance of a particular criminal objective, i.e., the defendant was part of an "ongoing" heroin delivery operation that occurred on almost a daily basis with the objective to deliver over 50 grams of a mixture containing heroin to the streets. See *id.* at 38-41.

We are persuaded that the focus of the *Porterfield* Court was on the specific intent of the parties to the conspiracy regarding the conspiracy's goal, scope, and criminal objective. The Court determined the conspiracy had as its objective the goal of delivering over fifty grams of a mixture containing heroin to the streets for profit. There was testimony that the coconspirators' conduct, "the mixing, packaging, delivery and sale," occurred on almost a daily basis, all of which the Court concluded must have "contributed to the promotion of" their objective to deliver to the streets for profit a mixture containing over fifty grams of heroin. *Id.* at 41. Moreover, the testimony evidenced that one of the coconspirators "was present when [the] defendant purchased three boxes of

---

there would be known customers. [*Id.* at 40, i.e., all agreed to accomplish the objective of the agreement. See *id.* at 38-40 (emphasis added).]

envelopes,"[31] each box of envelopes contained five hundred envelopes, and testimony established that two hundred envelopes "would total 50 grams of heroin." *Id.* at 40.[32] Fifteen hundred envelopes would have totaled 375 grams of heroin.

Hence, there was strong evidence establishing that the defendant and his coconspirators conspired to deliver approximately 375 grams of a mixture containing heroin. The record clearly evidenced that they knew the scope of their operation. It was irrelevant whether they were actually able to transact this amount before they were arrested.[33] The fact that they did transact more than 50 grams is important only to shed light on the defendant's agreement, i.e., to deliver, with the help of his coconspirators, approximately 375 grams of a mixture containing heroin.

B

In the instant case, with respect to count I, the district court, relying on *Porterfield, supra,* concluded that there was probable cause to believe defendant conspired with Boyer to possess with an intent to deliver over 650 grams of cocaine from the fall of 1989 to the spring of 1990. It stated:

---

[31] *Id.* at 40.

[32] Another coconspirator testified that "he sold approximately $1,000 worth of heroin each week," making it reasonable to infer that the drug operation lasted at least a week, if not longer. *Id.* at 39. At ninety bags a day for the defendant and one of the coconspirators, and ten to eleven bags for the other, it was easy to infer that the defendant delivered over fifty grams of a mixture containing heroin.

[33] *Asta, supra* at 611, citing *People v Gilman,* 121 Mich 187; 80 NW 4 (1899) (It is unnecessary "to show that the purpose contemplated by the unlawful agreement was accomplished").

I heard the testimony of Miss Boyer. Miss Boyer, when she started dealing to Kausler, called, made an—called to the Defendant here, and said, "I've got somebody else's money. Will you furnish?" He did. It came back. Miss Kausler testified she had a party and she used it up and gave it to her friends. That's conspiracy. [There is] [n]o question about it [i]n my mind. And the amounts she purchased over the period of time, through Cathy Boyer, who was skimming off the top, by the way, with or without knowledge of the Defendant. I don't know, she said it was without, but she was skimming. She was getting drugs, she was getting money. That's a conspiracy. And it was ongoing. So on Count I, involving Boyer, I'm gonna bind over on that, just like it's charged.

The circuit court distinguished *Porterfield, supra,* concluding that the binding over of defendant on the charges as alleged constituted an abuse of discretion.[34]

---

[34] The circuit court stated:

These factors do not establish a brightline for determining aggregation in other cases. And so it's not that every case has to meet the factors listed in *Porterfield*. However, this case, *People v Justice,* in my judgment does not come close to the factors that were involved in *Porterfield*. . . .

There was no evidence. At least it's not argued here today that there was any evidence that the second transaction, or subsequent transactions, were arranged during the course of the previous transaction. On the contrary, later transactions were not even discussed.

And so this court finds that there was insufficient evidence at preliminary examination to establish probable cause that the defendant conspired to deliver the volume charged. . . .

If I find aggregation in this case, I think it would be necessary almost in any case where there were multiple transactions to aggregate them, and I don't think this case meets the requirements of *Porterfield*. Even though inferences can be drawn and the volume is alleged to have been substantial, they were, in my estimation, separate transactions.

A majority of the Court of Appeals, relying on *Porterfield* held:

> [S]maller amounts could be aggregated to charge [the defendant] with conspiracy to deliver over 50 grams . . . [even though] the evidence [in this instance] . . . is not as strong as it was in *Porterfield*, the district court did not abuse its discretion in finding that probable cause existed to believe that defendant committed the charged offenses. [Unpublished opinion per curiam, issued December 28, 1995 (Docket No. 173326), slip op at 1-2.][35]

Considering all the evidence presented by the people, we agree with the result of the Court of Appeals and conclude that the question whether defendant conspired to commit the substantive offense may be guided by the general principles of conspiracy law articulated in *Porterfield*.

In the instant case, the relationship between Boyer and defendant may be broken down into two phases. The first phase,[36] lasted from fall 1989 until February 1990. During this phase, Boyer testified that she made one or two trips to Ann Arbor a month, even though not every trip was for the purpose of purchasing

---

[35] The Court of Appeals concluded:

The evidence indicated that Boyer and Kausler understood that, whenever they needed cocaine, they would call defendant. Boyer testified that she would get cocaine from defendant for her personal use and pay him for it when she could afford it. If, as defendant contends, he never knew if he would hear from Boyer again, he would not allow Boyer to pay him after he had already given her the cocaine. Boyer introduced Kausler to defendant so that she could purchase the drug directly from him. Both defendant and Kausler traveled more than one hundred miles to engage in the drug transactions. Boyer testified that both she and Kausler redistributed the cocaine purchased from defendant. [*Id.* at 2.]

[36] See n 1.

cocaine. Boyer also testified that she usually purchased an ounce (28.35 grams) of cocaine at a time. Thus, over the course of this time, it is reasonable to believe that four ounces (113.40 grams) of cocaine were purchased.[37]

The second phase, as alleged by the people in the indictment,[38] began in February 1990 and lasted until May 1990. In February, the quantities Boyer purchased increased because of Kausler's needs. Purchases occurred at a rate of one or two a week, and the parties began to use designated locations, approximately halfway between Ann Arbor and Petoskey, to make the purchases. Boyer testified that she told defendant that she was purchasing the larger amounts so that she could sell it to Kausler. The amount purchased from mid-February until May totaled fifty ounces (1,417.50 grams).[39]

---

[37] It is reasonable to assume that Boyer's testimony, where she refers to the "fall" through February, included the months of September, October, November, December and January. Her testimony that sometimes she made as many as two trips a month was offset by her testimony that not every trip resulted in a purchase. Nonetheless, it is reasonable to infer that on at least four trips, she made purchases, i.e., four purchases in five months. Thus, at an ounce (28.35 grams) a trip, her testimony supports the conclusion that at least four ounces (113.40 grams) of cocaine were purchased during this period.

[38] See n 1.

[39] On being questioned by the people, Boyer testified about the approximate quantities and dates of her purchases from defendant:

    [*The People*]: Just to, uh, clarify dates. Could you, um, tell us when it was that you first started obtaining large quantities from Tommy Justice, and when you stopped?

    [*Boyer*]: Um . . .

    [*The People*]: Whether it for yourself [sic], or for Suzy, or whoever.

    [*Boyer*]: It would have have [sic] to have been from some—the middle of February, and we stopped at the first of May. At the beginning of May.

    [*The People*]: Of what years?

Our assessment of this record persuades us that the people presented evidence that would permit "a person of ordinary prudence and caution to conscientiously entertain a reasonable belief"[40] that (1) defendant could have conspired with Boyer to possess with an intent to deliver over 650 grams of cocaine; (2) Boyer could have conspired with defendant to possess with an intent to deliver over 650 grams of cocaine; (3) defendant and Boyer could have possessed the intent to combine to deliver to Kausler and others over 650 grams of cocaine. See *Porterfield, supra.* Our conclusion is made in recognition that this is merely a bindover and not an issue of

---

[*Boyer*]: Of 1990. All in that—it was all that year. Small amount of time.

[*The People*]: And what would be the total amount that you bought, during that whole time period?

[*Boyer*]: Um, I'm not sure. Totally ever? That whole . . .

[*The People*]: Just during, uh, that time period of February '90 to May '90? Total number of ounces?

[*Boyer*]: For Suzy.

[*The People*]: For whoever.

[*Boyer*]: About—anything I say would be a guess.

[*The People*]: Well, your best approximation?

[*Boyer*]: We got her probably four or five ounces a week, for probably eight or nine, between eight and ten weeks, is all we dealt with her.

[*The People*]: Do you recall, uh, your testimony at the Grand Jury?

[*Boyer*]: Mm-huh. (Affirmative response)

[*The People*]: Do you recall testifying that you bought 50 ounces?

[*Boyer*]: That's about what it would be.

[*The People*]: That sound about right?

[*Boyer*]: You take eight—if you take eight weeks, times four or five a week, it'd be about—you know, it was at a period, probably eight to ten weeks, 'cause we started in the middle of February and we ended the, like the second week of May. Then there were some weeks that there were more, and some less.

[40] *Coleman, supra* at 317.

guilt beyond a reasonable doubt. *Coleman, supra.* We may only overturn the district court's determination if we conclude that its finding was an abuse of discretion. *Talley, supra.* Because we cannot say that the district court's finding was "so palpably and grossly violative of fact and logic,"[41] we conclude that its finding was not an abuse of discretion.

We therefore conclude that it was not an abuse of discretion to find that defendant could have conspired with Boyer to possess with an intent to deliver over 650 grams of cocaine between the fall of 1989 and the spring of 1990.

C

We now turn to whether the district court's finding of probable cause with respect to count II was an abuse of discretion.

The district court made the following findings in concluding that there was probable cause to believe defendant conspired with Kausler to possess with an intent to deliver over 225 grams but less than 650 grams of cocaine between the spring of 1990 and December 1990:

> When we get to the Kausler matter, we got a little bit different situation, but there was definitely a conspiracy there to deliver. She was buying eight ounces. She paid in advance for that money [sic (cocaine)] and there was an agreement to send the cocaine up here. And although she said she didn't use it all, this Court's going to infer that she couldn't have used eight ounces, that she had it for other purposes, and she did later testify she sold sometimes two or three grams. And she distribute[d] to someone on the

---

[41] *Talley, supra* at 387, quoting *People v Charles O Williams*, 386 Mich 565, 573; 194 NW2d 337 (1972).

way back. And they tried it. Driving—not on that occasion,
but other ones when she went with Yeager, she was dealing
directly with this man. Mr. Yeager was involved. He was get-
ting part of it. He was known there.

Our assessment of the record persuades us that it
was not an abuse of discretion to find that probable
cause existed to believe defendant conspired with
Kausler to possess with an intent to deliver more than
225 grams but less than 650 grams of cocaine.

The people alleged that the agreement was formed
at a point sometime between March 1990 to Decem-
ber 1990. The district court inferred that defendant
formed an intent to deliver over 225 grams but less
than 650 grams of cocaine sometime during that
period. It also must have inferred that Kausler formed
the very same intent as defendant and that this intent
was shared by both of them to combine to deliver
over 225 grams but less than 650 grams of cocaine.

We conclude that the record was sufficient to
enable the district court to find that probable cause
existed to believe that (1) defendant could have con-
spired to possess with an intent to deliver over 225
grams but less than 650 grams of cocaine, (2) Kausler
could have conspired to possess with an intent to
deliver over 225 grams but less than 650 grams of
cocaine, and (3) defendant and Kausler could have
possessed the intent to combine to deliver to others
the statutory minimum as charged. See *Porterfield,
supra.* Kausler testified that she and defendant
agreed to combine and specifically intended to pursue
the criminal objective of delivering that amount of
cocaine. Specifically, when being questioned by the
people, Kausler outlined the course of her dealings
with defendant after Boyer left for Florida:

[*The People*]: When was the first time after that that you had a transaction with Mr. Justice directly?

[*Kausler*]: It wouldn't have been very long after that. Maybe a month, at the most.

[*The People*]: And where did the first transaction take place, when you went by yourself?

[*Kausler*]: I don't remember. It, it—I don't remember. It was either at his house, or at West Branch.

[*The People*]: Okay, let's talk about West Branch. How many times did you meet him there?

[*Kausler*]: Anywhere between two and five.

[*The People*]: And what would happen when you'd met?

[*Kausler*]: I usually get cocaine.

[*The People*]: Would you be by yourself? Everytime [sic]?

[*Kausler*]: No.

[*The People*]: Who else would go with you?

[*Kausler*]: James Yeager.

\*          \*          \*

[*The People*]: How much, uh, would you purchase when you met him at West Branch, each time? Was it—did it vary, or . . .

[*Kausler*]: It varied, um . . .

[*The People*]: From what to what?

[*Kausler*]: . . . sometimes it was two, sometimes it was four ounces.

\*          \*          \*

[*The People*]: What would be the total number of times that you directly purchased from [defendant]?

[*Kausler*]: It's very difficult to remember the exact amount, but probably ten, maybe more.

Kausler also testified that on one occasion she purchased approximately 226.80 grams of cocaine from defendant, and he was aware that she was distributing the cocaine. See n 9.

Kausler testified as follows regarding the specifics of her arrangement with defendant with respect to the delivery of cocaine when he visited her:

> [*The People*]: Okay, what was the discussion?
>
> [*Kausler*]: We were—I think we were talking about why Cathy wanted me to send her the money for coke. And then, um, have [her] send me the coke from [defendant], so she could get—get more money, and step on it.
>
> [*The People*]: Um . . .
>
> [*Kausler*]: Excuse me.
>
> [*The People*]: . . . did he provide any cocaine to you, at that time? On that visit?
>
> [*Kausler*]: It seems like he gave me some, so I could get high, yes.
>
> \*    \*    \*
>
> [*The People*]: You don't remember how much that was?
>
> [*Kausler*]: No. But at that point, I was addicted, so it took a bit to get high.
>
> [*The People*]: Did you, uh, make any arrangements, at that time, for a very large purchase?
>
> [*Kausler*]: Possibly.
>
> [*The People*]: Okay. What was that, uh, transaction about?
>
> [*Kausler*]: That probably would have been my last transaction. Eight ounces [226.80 grams of cocaine].

Kausler's testimony evidenced that it was not "palpably and grossly violative of fact and logic"[42] for the district court to have inferred that defendant possessed the requisite intent to conspire with Kausler to possess with intent to deliver more than 225 grams but less than 650 grams of cocaine at a point during the period charged by the people.[43]

---

[42] *Talley, supra* at 387.

[43] The stance the dissent takes conflicts with the fundamental rule that "[t]his court may not agree with the findings of [the] magistrate but it has

CONCLUSION

This Court holds that in order to bind defendant over for conspiracy there must be probable cause to believe that the respective coconspirators intended to accomplish the substantive offense. We conclude, therefore, that, with regard to count I, the district court's finding that probable cause existed to believe defendant was guilty of conspiracy did not constitute an abuse of discretion because the evidence was sufficient to reasonably infer that defendant and Boyer could have intended to possess with an intent to deliver over 650 grams of cocaine at a point during the period charged by the people. Also, we conclude with respect to count II that it was not an abuse of discretion to find probable cause existed to believe defendant conspired with Kausler to possess with an intent to deliver over 225 grams but less than 650 grams of cocaine because testimony permitted the district court to reasonably infer that defendant and Kausler combined to accomplish the criminal objective as charged. Therefore, we affirm both the deci-

no right to substitute its judgment . . . except in case of a clear abuse of discretion." *People v Dellabonda*, 265 Mich 486, 491; 251 NW 594 (1933).

In this case, we are persuaded that the evidence presented by the people enabled the district court to reasonably entertain the belief that defendant, along with Boyer and Kausler, respectively, intended to possess with an intent to deliver the quantities of cocaine as alleged to third parties. It was reasonable for the district court to infer from the record that both Boyer and Kausler intended to deliver cocaine to others: Boyer routinely shared it with those who accompanied her on trips to make purchases and Kausler would provide it to those persons she associated with on various occasions.

In concluding that the district court's findings were not "grossly violative of fact and logic," we are not ruling that defendant, along with Boyer and Kausler, respectively, did conspire to possess with a specific intent to deliver the amounts as charged but, rather, we have merely determined that it cannot be said that the district court's finding was an abuse of discretion, i.e., that it was "grossly violative of fact and logic."

sion of the Court of Appeals with respect to count I concluding that there was no abuse of discretion in the district court's bindover and its decision to reverse the circuit court's quashing of the indictment with respect to count II.

MALLETT, C.J., and BRICKLEY, BOYLE, and WEAVER, JJ., concurred with RILEY, J.

CAVANAGH, J. (*dissenting*). I agree with the majority's holding that to bind Mr. Justice over on the two counts of conspiracy there must be probable cause to believe that he and his coconspirators shared the specific intent to accomplish the substantive offenses charged. However, notably absent from the majority's holding and analysis is the requirement that both conspirators must possess the specific intent to deliver the *charged amounts* from the time of the *formation* of the conspiratorial agreement that is the basis of the conspiracy charge. I disagree with the majority's conclusions on both counts because I do not find sufficient evidence in the record to establish that Mr. Justice and his respective coconspirator specifically intended to deliver the charged amounts at the time that the conspiratorial agreement was formed.

Regarding count I, I would hold that the district court abused its discretion in binding Mr. Justice over on conspiracy to possess with intent to deliver over 650 grams of cocaine. I believe the evidence was insufficient to allow a reasonable trier of fact to infer that he and his coconspirators had a specific intent to *deliver* over 650 grams of cocaine at the time that

they *formed* their drug sale-purchase agreement.[1] Also, I do not believe that there is sufficient evidence that Mr. Justice and Ms. Boyer possessed the intent to *combine* to deliver to third persons over 650 grams of cocaine. Further, I believe that the district court abused its discretion in binding Mr. Justice over on the conspiracy charge of possession with intent to deliver between 225 and 650 grams of cocaine. Similar to count I, I do not believe there was sufficient evidence to establish Mr. Justice's or Ms. Kausler's intent to deliver the charged amounts or their intent to combine to deliver the charged amounts.

### I. THE BINDOVER

To bind a defendant over for trial, the district court must find that a specific crime has been committed and probable cause to believe the defendant committed the crime charged. *People v King*, 412 Mich 145, 152-153; 312 NW2d 629 (1981). In determining whether bindover is proper, the court should consider the credibility of the witnesses in addition to their competency, and the weight to be accorded their testimony. It is also true that the district court should not dismiss the charge when there is conflicting evidence or reasonable doubt about the defendant's guilt because those are issues for the jury.

However, *King* also instructs:

> The inquiry is not limited to whether the prosecution has presented evidence on each element of the offense. The [district court] is required to make [its] determination "after an examination of the whole matter." Although the prosecution has presented some evidence on each element, *if upon*

---

[1] Count I concerns the alleged drug transactions between Mr. Justice and Cathy Boyer.

*an examination of the whole matter the evidence is insuf-*
*ficient to satisfy the [district court] that the offense*
*charged has been committed and that there is probable*
*cause to believe that the defendant committed it, then [it]*
*should not bind the defendant over on the offense charged*
but may bind him over on a lesser offense as to which [it] is
so satisfied. [*Id.* at 154 (emphasis added).]

The majority should have kept these concepts in
mind when it reviewed for abuse of discretion the dis-
trict court's determination that the evidence was suffi-
cient to warrant a bindover on each conspiracy count.
I would hold that the district court abused its discre-
tion in binding the defendant over on either count
because there was insufficient evidence to establish
that either offense was committed and probable
cause to believe that Mr. Justice committed either
offense.

## II. CONSPIRACY

The majority acknowledges:

To be convicted of conspiracy to possess with intent to
deliver a controlled substance, the people must prove that
(1) the defendant possessed the specific intent to deliver
the statutory minimum as charged, (2) his coconspirators
possessed the specific intent to deliver the statutory mini-
mum as charged, and (3) the defendant and his coconspira-
tors possessed the specific intent to combine to deliver the
statutory minimum as charged to a third person. See, e.g.
[*People v Blume*, 443 Mich 476, 485, 508, n 31; 505 NW2d
843 (1993)]. [*Ante* at 349.]

Further, the majority also acknowledges that " '[t]he
gist of the offense of conspiracy lies in the unlawful
agreement' . . . [meaning] . . . [t]he crime is com-

plete upon formation of the agreement . . . ." *People v Carter*, 415 Mich 558, 568; 330 NW2d 314 (1982).

Putting these concepts together, it follows that for the defendant to be guilty of the charged conspiracy counts, Mr. Justice and his coconspirators would have had to have intended to deliver the charged amounts from the time that they formed an agreement to deliver the cocaine to third persons. If Mr. Justice and his coconspirators did not specifically intend to deliver the charged amounts, then they could not have had an agreement to deliver the charged amounts. If there was no agreement to deliver the charged amounts, then there was no conspiracy.

### III. COUNT I

Count I involves an alleged conspiracy between Mr. Justice and Cathy Boyer to deliver over 650 grams of cocaine to third persons. Although the charge alleges a conspiracy between the Fall of 1989 through the Summer of 1990, the record evidence only establishes Boyer's possible intent to deliver when Suzanne Kausler entered the picture in February 1990. Before February 1990, there is no evidence in the record that Boyer intended to deliver cocaine to third persons. Even if she intended to do so, there is no evidence that Mr. Justice knew she intended to do so or that he intended to combine with her to do so.

What the majority focuses on in Count I are the transactions occurring between February and May 1990 in which Boyer purchased cocaine on behalf of Kausler. For Mr. Justice to be properly bound over on

this count, he and Boyer would have to have agreed to deliver over 650 grams of cocaine to third persons at the time they formed their unlawful agreement. The record in this case is void of any evidence that there was any kind of agreement that there would be deliveries of the quantities necessary to reach the level charged in this count. Rather than being considered as part of an ongoing conspiracy to deliver cocaine, the testimony indicates that the drug transactions are properly labeled as separate transactions.[2]

The lack of evidence to establish that Mr. Justice and his coconspirators possessed the requisite intent

---

[2] Called as a prosecution witness, Cathy Boyer, the alleged coconspirator in count I, provided this testimony:

Q. That was for that one incident, right? That one time?

A. Right.

Q. And then when you needed it again, you would call him up, and you would go down again? Correct?

A. Or he would come part-way.

Q. Okay. But each time, you had to make a phone call, correct?

A. One of us did.

Q. Okay, so there wasn't an on . . .

A. Either he called us, or we called him.

Q. Okay, there wasn't an on-going plan, "I'll meet you every Wednesday."

A. No.

Q. "I'll meet you every Friday."

A. No.

Q. "I'll met [sic] you twice a week."

A. No.

Q. Each one was arranged individually?

A. Right. When Suzy needed it, we called him.

Q. Okay. Each delivery that you testified to, you indicated was a different price. Each one was separately bargained for, is that a fair statement?

A. Not always.

Q. Well . . .

A. Sometimes it would be the same price . . .

*Q.* Okay.

*A.* . . . for a month, and then it might . . .

*Q.* Okay.

*A.* . . . according to supply and demand, it could be . . .

*Q.* Okay.

*A.* . . . nine hundred dollars one day, and two days later be fifteen hundred.

*Q.* Okay, but each time it was separately bargained for?

*A.* Right.

*Q.* It could be the same price, it could be a different price?

*A.* Right.

*Q.* Okay. Payment was made after each delivery?

*A.* With each delivery, right.

\*     \*     \*

*Q.* Each time that you went down to see Mr. Justice, he never knew if he was going to see you again, then, is that a fair statement?

*A.* Yep.

*Q.* Until you called him again the next time?

*A.* Unless I went to see him as a friend.

*Q.* Right.

*A.* We were friends.

*Q.* Right. Okay.

*A.* Whether I went there for drugs or not, I still saw him. He was my friend.

Suzanne Kausler, the alleged coconspirator in count II, provided similar testimony, regarding the occasions on which she dealt directly with the defendant.

*Q.* Okay. But each of these meetings was an individual meeting? Is that a fair statement?

*A.* Yes, sir.

*Q.* In other words, you didn't tell Mr. Justice, "Well, I'll see you every Wednesday, at . . .

*A.* No.

*Q.* . . . West Branch.

*A.* Correct.

*Q.* Or, "I'll be down in Ann Arbor every Monday."

*A.* I understand what you're saying.

*Q.* Okay. Each one—you made a phone call, saying . . .

*A.* One time, right.

is shown by the majority's conclusion that defendant *could* have conspired with Boyer to deliver over 650 grams, Boyer *could* have conspired with Mr. Justice to deliver that amount, and that Mr. Justice and Boyer *could* have possessed the intent to combine to deliver over 650 grams to third persons. I agree that anything is possible, but this Court should require sufficient evidence before it allows a bindover, especially when this count involves an offense mandating a sentence of life without parole.

### IV. COUNT II

Count II alleges that Mr. Justice conspired with Suzanne Kausler to deliver or possess with intent to deliver between 225 and 650 grams of cocaine between March 1990 and December 1990. This count concerns only the drug transactions occurring between Kausler and Mr. Justice after the Boyers were preparing to move to Florida. It was only after this time that Kausler began to deal directly with Mr. Justice.

To bind Mr. Justice over on this count, the prosecutor must establish that Mr. Justice specifically intended to deliver between 225 and 650 grams of cocaine, Kausler specifically intended to *deliver* between 225 and 650 grams of cocaine, and Mr. Justice and Kausler specifically intended to combine to deliver that amount to third persons. At this point, we

---

*Q.* . . . . "I need something. Here, this is how much I want." And then there was a meeting set up following that phone call?

*A.* Correct.

know that Kausler is a cocaine addict. Obviously, cocaine addicts use a significant amount of cocaine.[3] So, even though Kausler made one purchase over 225 grams, I do not believe that that alone is sufficient probable cause to believe that she intended to deliver that entire amount. I also question whether there is probable cause to believe that Mr. Justice intended to combine with Kausler to deliver that entire amount. Rather, because of her cocaine addiction, I believe it more probable that Kausler intended to use most of it herself. In fact, she testified that she sold only a few grams here and there.

As this Court instructed in *Blume, supra* at 485-486:

> Clearly, the prosecutor must present more evidence than the seller's knowledge of the buyer's proposed illegal purpose. For intent to exist, the defendant must know of the conspiracy, must know of the objective of the conspiracy, and must intend to participate cooperatively to further that objective. " '[T]o establish the intent, the evidence of knowledge must be clear, not equivocal . . . because charges of conspiracy are not to be made out by piling inference upon inference . . . .' " [*People v Atley*, 392 Mich 298, 310; 220 NW2d 465 (1974)], quoting *Direct Sales Co* [*v United States*, 319 US 703; 63 S Ct 1265; 87 L Ed 1674 (1943)].[14]

> ----
> [14]This Court stated in *Atley* at 314-316, that a conspiracy may be established by circumstantial evidence or an inference, provided that the evidence and circumstances are " 'within safe bounds of relevancy and be such as to warrant *a fair inference of the ultimate facts*.' (Emphasis added.)" *Id.* at 311 . . . .

To bind Mr. Justice over in this case, the prosecutor would need to pile inference upon inference. Because

----

[3] As an example, there is testimony from the preliminary examination that James Boyer, who considered himself a cocaine addict, used from half an ounce to an ounce a day.

there is no evidence in the record to indicate that Mr. Justice knew Kausler intended to redistribute some of the cocaine, the prosecution has to infer that intent from the quantities delivered to Kausler. Then, the prosecution must infer that she intended to redistribute the charged amount of between 225 and 650 grams.

Similar to the majority's conclusion regarding count I, I believe it was an abuse of discretion for the court to bind Mr. Justice over on this count because there was not sufficient evidence presented at the preliminary examination to support a finding of probable cause on this conspiracy count.

## V. CONCLUSION

I believe that the transactions involved in both counts were not part of a defined conspiracy, but rather were separate transactions. Thus, I believe it was an abuse of discretion for the court to have bound Mr. Justice over on either count. "[T]he fact that there was some redistribution of the cocaine does not establish that there was an agreement that the coconspirators would redistribute it and return for more when the supply was exhausted. There simply was no evidence that defendant and Kausler or Boyer were involved in an ongoing conspiracy to deliver the aggregate quantities charged." *People v Justice*, unpublished opinion per curiam of the Court of Appeals, issued December 28, 1995 (Docket No. 173326) (WHITE, J., dissenting), slip op at 4. For these reasons, I would reverse the decision of the Court of

Appeals and reinstate the judgment of the circuit court.

KELLY, J., took no part in the decision of this case.